**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

PAUL DURLING,

                                        Plaintiff,

                v.                                                    No. 03-CV-724
                                                                        (FJS/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

**APPEARANCES:**                                **OF COUNSEL:**

STEPHEN J. MASTAITIS, JR., ESQ.
Attorney for Plaintiff
1412 Route 9P
Saratoga Springs, New York 12866

HON. GLENN T. SUDDABY                        WILLIAM H. PEASE, ESQ.
United States Attorney for the                Assistant United States Attorney
Northern District of New York
Attorney for Defendant
Post Office Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER[1]**

        Plaintiff Paul Durling ("Durling") brought this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying his application for benefits under the Social Security Act.  Durling moves for a

finding of disability and the Commissioner cross-moves for a judgment on the pleadings.

Docket Nos. 5, 7.  For the reasons which follow, it is recommended that the

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Commissioner's decision be remanded for further proceedings.

## I. Procedural History

On February 6, 1981, Durling filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 83.[2] That application was denied after the initial determination and following reconsideration. T. 80-87. Durling requested a hearing before an administrative law judge (ALJ), T. 231, which was held before ALJ George M. Jacobs on January 15, 1982. T. 224. Durling was represented by counsel. T. 224. In a decision dated March 30, 1982, the ALJ denied Durling's claims. T. 224-30. On June 28, 1982, the Appeals Council denied Durling's request for review, thus making the ALJ's findings the final decision of the Commissioner. T. 232-33. The Appeals Council determined that Durling was a member of the class identified in Stieberger v. Sullivan, 792 F. Supp. 1376 (S.D.N.Y. 1992), and was therefore entitled to have this application re-adjudicated.[3] T. 33-34.

Durling re-applied for benefits on January 27, 1999, but his application was denied initially and on reconsideration. T. 234-38, 252-54. Durling requested a hearing before an ALJ, T. 239, which was held on September 17, 1999 before ALJ Hastings Morse. T. 40. Durling was represented by counsel. T. 248. In a decision dated October 22, 1999, the ALJ denied Durling's claims. T. 40-47. This decision was remanded by the Appeals

---

[2] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 4.

[3] Class action settlement which established procedures to ensure that the Social Security Administration followed and applied Second Circuit disability decisions and allowed reopening such cases.

Council on October 18, 2000 for reconsideration of Durling's subjective complaints and for consultation by a vocational expert. T. 31-35.  Durling's first application for benefits was consolidated with his second application under <u>Stieberger</u>. T. 33-35. On remand, ALJ Robert Wright held a hearing on November 21, 2000 and denied Durling's claims on March 14, 2001. T. 14-20, 48-79. On May 3, 2003, the Appeals Council denied Durling's request for review, thus making the ALJ's findings the final decision of the Commissioner. T. 4-6.

This action followed.

## II. Contentions

Durling contends that the ALJ erred when he failed properly to consider Durling's subjective complaints of pain, failed to accord proper weight to the opinion of Durling's treating physician, and that there was not substantial evidence to support a finding that Durling could perform a full range of light work. The Commissioner contends that there was substantial evidence to support the determination that Durling was not disabled.

## III. Facts

Durling is currently sixty-one years old, previously worked as a police officer and has a high school diploma. T. 51. Durling alleges that he became disabled on April 14, 1981 due to back and neck injuries.  T. 67, 90.

**V.  Standard of Review**

**A. Disability Criteria**

A claimant seeking disability benefits must establish that "he [or she] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2002).  In addition, the claimant's impairments must be of such severity that he or she is not able to do previous work or any other substantial gainful work considering the claimant's  age, education, and work experience, regardless of whether such work exists in the immediate area, whether a specific job vacancy exists, or whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 1382c(a)(3)(B) (2002).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 416.920, to evaluate SSI disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the

4

> claimant is unable to perform his [or her] past work, the
> [Commissioner] then determines whether there is other work which
> the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. § 416.920 (2004).

The plaintiff has the burden of establishing disability at the first four steps. Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000). However, if the plaintiff establishes that an impairment prevents him or her from performing past work, the burden then shifts to the Commissioner to determine if there is other work which the claimant could perform. Id.

### B. Scope of Review

The reviewing court must determine if the commissioner has applied the proper legal standards and if the decision is supported by substantial evidence. Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw, 221 F.3d at 131 (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). The ALJ must articulate specific factors to allow the reviewing court to determine whether substantial evidence supports the decision. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). If the Commissioner's finding is supported by substantial evidence, it is conclusive and on review, a court may not substitute its interpretation of the administrative record for that of the Commissioner. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998); Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

## V.  Discussion

### A. Medical Evidence

Durling was involved in automobile accidents on October 7, 1974,  May 30, 1975, and February 13, 1980, all of which caused injuries to his neck and back. T. 159, 206, 278. After the first accident, Durling was diagnosed with acute lumbar strain at the Saratoga Hospital Emergency Room. T. 163.  An X-ray in February 1980 showed a slight limitation of flexion and extension but was otherwise unremarkable. T. 160.

Dr. Robert Kercull treated Durling from June 1975 to February 1981. T. 191-96, 199-204, 214-15.  On April 22, 1980, there was no sensory loss, straight leg raising was 30° on the left and 70° on the right, there was no sciatic notch tenderness, no spasm, and forward bending was within 6" of the floor. T. 201. Durling complained of radicular pain and persistent lumbar discomfort. T. 201-02.  In July 1980, Dr. Kercull diagnosed Durling with chronic whiplash syndrome and chronic lumbrosacral strain. T. 191. Durling's treatments included Transcutaneous Electric Nerve Stimulation (TENS),[4] traction, muscle relaxants (Flexoril), analgesics, local heat, exercise programs, and Zomax, Darvocet, Robaxin, and Empirin # 3 for pain. T. 191, 214. Durling complained that the Darvocet and Flexoril made him sleepy. T. 202.  Durling consistently complained of pain and difficulty sitting for long periods of time. T. 191, 214. In February 1981, lateral bending was 50%, a neurological exam in both the upper and lower extremities was normal, and surgery was not contemplated. T. 215. Dr. Kercull referred Durling to Dr. Fredric Fagelman, a neurosurgeon. T. 201.  Dr. Kercull found that Durling had a partial disability. T. 215.

---

[4] TENS involves the application of skin electrodes to nerve endings in order to block the transmission of pain signals to the brain. Streeter v. Barnhart, No. 01 Civ. 4066(DLC), 2002 WL 467504, at *14 n.4 (S.D.N.Y. Mar. 28, 2002).

Dr. Fagelman evaluated Durling on April 30, 1980. T. 197-98. Durling showed restricted mobility at 60° to 70°, the entire lower lumbar spine was tender, and a peripheral neurological examination was normal. T. 197. There was no evidence of any motor weakness and no evidence of sensory disturbance, and hip rotation and straight leg raising produced some back pain with no radicular component. T. 197. The impression was chronic lumbosacral strain with no significant disc herniation. T. 197. Dr. Fagelman thought it was possible that Durling could return to work on May 12, 1980. T. 197.

Dr. Feyman treated Durling from June 1980 to November 1981. T. 165-66. In March 1981, Dr. Feyman estimated that Durling had lost 5% of the flexion and extension of his cervical spine and 10% of the flexion and extension of his lumbar spine. T. 165. There was no muscle spasm, no atrophy, no swelling, and no sensory or reflex deficiency, but there was mild tenderness of the mid-cervical and upper lumbar spine. T. 166. Durling wore a TENS unit and took Flexoril. T. 166. In November 1981, Dr. Feyman felt that Durling was permanently and completely disabled and was not able to return to any type of work. T. 221, 414.

On September 25, 1980, Durling was examined by Dr. William Bronk. T. 206-07. Durling complained of lower back pain aggravated by sitting for long periods and discomfort when lying flat on his back. T. 206. There was no motor weakness in the lower extremities, deep tendon reflexes were intact, Durling had stiffness and restriction in bending, and  X-rays showed mild osteoarthritic changes. T. 206. Durling's flexion of the spine was 30° and straight leg raising was negative. T. 207. Dr. Bronk found that Durling was permanently disabled. T. 206-07, 408-09.

On December 4, 1980, Dr. Nicholas Teresi examined Durling following a prior examination on April 2, 1979. T. 188-90. Durling had mild defects in flexion and extension of the cervical spine, there was no atrophy, no defects of the upper extremities, no spasm or rigidity of the lumbar muscles, and there was moderate restriction of the lower extremities. T 188-89. An x-ray of the cervical spine showed a normal curvature, no fracture, and no bone pathology. T. 189. The intervertebral disc space appeared normal and there was no change when compared with an x-ray taken in April 1979. T. 189. An x-ray of the lumbosacral spine showed no fracture, minimal degenerative changes, intervertebral disc spaces were normal, and there was no change when compared to an x-ray taken in April 1979.  Dr. Teresi concluded that Durling had an increase in the restriction of the motion of the spine and that he had an overall moderate partial disability of 25%. T. 190.

Dr. Robert Reid examined Durling on June 12, 1981. T. 168. Dr. Reid noted that Durling's current medications were Empirin, Flexoril, and Inderal, that he had physiotherapy frequently, and that he used a TENS, which Durling stated did not relieve his pain. T. 168. The examination was generally normal except tenderness of lumbar sacral areas and cervical spine. Durling's reflexes were brisk and equal in all extremities. T. 168. Dr. Reid diagnosed Durling with hypertension, discogenic disease, and arthritis. T. 168. A chest x-ray and electrocardiogram taken on June 12, 1981 were normal. T. 171. Dr. Reid found that Durling could sit six hours, stand four hours, and walk two hours in an eight hour work day, could lift and carry up to twenty pounds occasionally, that he could occasionally bend but could not squat, crawl, or climb, and that there were no limitations with respect to grasping, pushing, pulling, and other fine manipulation. T. 169-70.

8

Durling was examined by Dr. Schlesinger on July 21, 1981. T. 176. Durling had been treated with halter traction for his cervical spine. T. 177. The cervical and lumbar spine had a good range of motion, there was tenderness in the cervical and lumbrosacral spine, there was no impairment to pinprick in Durling's upper and lower extremities, and the examination was otherwise largely normal. T. 177-78. Dr. Schlesinger found that Durling was not able to return to work as a patrolman or at a desk job but that Durling might be able to work in other areas of light work. T. 178.

An x-ray taken in October 1983 of the cervical and lumbrosacral spine was normal with no evidence of bone injury, spondylosis, [5] or bony abnormality. T. 307. Durling was treated regularly at Abundant Life Chiropractic Center from January 8, 1991 until February 24, 1999. T. 364-69, 371-406. In September 1993, Durling was examined by Dr. Mohler, an orthopedic surgeon, who opined that Durling's current degree of disability was moderate, partial and temporary, and that Durling was restricted in repetitive bending, lifting, working overhead, and working heights. T. 310-313. The impression was spondylosis of the cervical, thoracic, and lumbrosacral spine; chronic low back pain in the right lower extremity, chronic cervical pain, moderate obesity, and multiple allergies. T. 310.

On January 28, 1996, Durling presented to the Glens Falls Hospital Emergency Room for acute onset of left lower back pain which caused him to fall down a flight of stairs. T. 324. Durling's back had a very tender large area of edema in the lateral left lumbar back and moderately severe ecchymoses, or black-and-blue marks, in a small

---

[5]A degenerative condition affecting vertebrae.  Veloz v. New York, 339 F. Supp. 2d 505, 522 (S.D.N.Y. 2004).

9

area of the right lower back. T. 326, 447. Pelvic x-ray and blood tests were normal. T. 326-330.  An x-ray taken on November 25, 1997 showed rotation malposition, mild left scoliosis, decreased lordosis, arthritic changes at L-2 to L4, and there was decreased interosseous spacing at L2 to L4. T. 370. An MRI on December 16, 1999 showed disc desiccation, degenerative changes, and disc bulging at multiple levels. There was no frank disc herniation or spinal stenosis. T. 415-16.

## B. Treating Physician Rule

Durling contends that the ALJ did not provide good reasons for discrediting the opinions of his treating physicians. The Commissioner contends that the ALJ properly weighted the opinions of Durling's treating physicians and explained the weight given to each.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant . Harris v. Railroad Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2003); Shaw, 221 F.3d at 134. Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord that opinion: (1) the frequency of examination, and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. Schaal, 134 F.3d at 504. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent is the opinion, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e) (2004).

Here, Drs. Feyman and Kercull both treated Durling for his back and neck injuries on several occasions over several years and can be considered treating physicians. Dr. Feyman found that Durling was permanently disabled and Dr. Kercull found that Durling had a mild partial disability of 25%. T. 215. The ALJ rejected the opinion of Dr. Feyman because Dr. Feyman did not describe clinical findings to support this opinion.  The ALJ did provide a specific reason for what weight was given to Dr. Kercull's opinion. The ALJ also rejected the opinion of Dr. Bronk that Durling was permanently disabled because the only specific clinical abnormality found during Dr. Bronk's examination was a limitation of motion. T. 16. Drs. Teresi, Mohler, and Kercull found that Durling had a mild partial disability. T. 190, 310-13. Drs. Schlessinger, Reid, and  two non-examining agency physician found that Durling was capable of light work. T. 169-70, 179-80.

The ALJ here did not give the proper weight to Dr. Feyman's opinion, which is supported by the record. Several other doctors shared the opinion that Durling suffered

11

permanent disability, although their opinions varied as to the degree of disability, and Durling had a loss of the extension of his spine and showed restricted mobility. Durling was treated with TENS, muscle relaxants, analgesics, local heat, exercise programs, several different pain medications, went to physical therapy and physiotherapy, had chiropractic treatments for many years, and had halter traction. T. 168, 177, 214.  Durling also visited several doctors, made an attempt to go back to work, and presented to the emergency room for lower back pain. T. 177, 324.  Dr. Feyman's opinion was consistent with other substantial evidence in the record and the ALJ failed to accord his opinion the proper weight.

Durling's motion on this ground should be granted.

### C. Pain and Credibility

Durling contends that the ALJ erred when he discredited his complaints of pain. The Commissioner contends that the ALJ properly considered Durling's complaints of pain.

The basis for establishing disability includes subjective complaints of pain, even where the pain is unsupported by clinical or medical findings, provided that the underlying impairment can be "medically ascertained." 20 CF.R. 404.1529 (2004); Snell, 177 F.3d at 134. A finding that a claimant suffers from disabling pain requires medical evidence of a condition that could reasonably produce pain. An ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be expected to be consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2004); Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  Pain is a subjective concept "difficult to

prove, yet equally difficult to disprove," and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  If there is a rejection of the claims of disabling pain, the ALJ must provide specific reasons for doing so. Saviano v. Chater, 956 F. Supp. 1061, 1071 (E.D.N.Y. 1997).

The claimant's credibility and motivation as well as the medical evidence of impairment are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Lewis v. Apfel, 62 F. Supp. 2d 648, 653 (N.D.N.Y. 1999) (Kahn, J.). If there is conflicting evidence about a claimant's pain where the degree of pain complained of is not consistent with the impairment, the ALJ must make credibility findings. Donato v. Secretary of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board,

13

etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2004).

The ALJ rejected Durling's allegations regarding extreme pain and dizziness from medications based on only the limited clinical and laboratory findings and the description of Durling's daily activities. T. 18. The ALJ found that Durling's allegations as to the frequency and severity of his symptoms and limitations were not fully credible based on the medical findings, Durling's daily activities, and the opinions of examining physicians. T. 17. This conclusion is not supported by substantial evidence in the record as the ALJ failed properly to consider the amount of medications taken by Durling, his extensive treatments, and his good work record.

While Durling testified that he did laundry, cooked, occasionally went to the grocery store, fished and hunted, and socialized, he also testified that he had constant pain in his back and neck that radiated into both legs, numbness in his legs which was aggravated by staying in one position for a long period, and that he only slept for two hours at a time. T. 65, 70-71, 168, 201, 214. Durling took several medications, including Zomax, Flexeril, Empirin, and Darvocet, used a TENS, had electric stimulation and physical therapy, and used analgesics, local heat, and exercise programs. T. 56, 65, 71, 168, 214. Durling made regular visits to the chiropractor from 1981 to 1999. T. 364-69, 371-406. Durling also presented to an emergency room for acute onset back pain. T. 324.

An MRI showed disc desiccation, degenerative changes, and disc bulging at multiple levels. T. 415-16. X-rays in February and December, 1980 and September and

14

October, 1983 were largely unremarkable with a slight limitation of flexion and extension, with minimal degenerative changes but normal curvature, no fracture, and no bone pathology. T. 160,  189, 206, 307. An X-ray taken on November 25, 1997 showed rotation malposition, mild left scoliosis, decreased lordosis, and arthritic changes at L-2 to L4, and there was decreased interosseous spacing at L2 to L4. T. 370.

Only Drs. Reid and Schlessinger, both of whom examined Durling once, found that he was not disabled.  Drs. Feyman and Bronk found that Durling was permanently disabled, and Drs. Tersesi, Kercull, and Mohler found that Durling was at least partially disabled. Six months after the third accident, Durling attempted to return to work for light duty but after two months, Durling was unable to continue working because of back pain. T. 67. Durling had worked as a police officer for sixteen years. T. 54. "The Second Circuit has established that a claimant with a good work record is entitled to substantial credibility when claiming inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983); Dombrowski v. Chater, 960 F. Supp. 558, 565 (N.D.N.Y. 1997) (Scullin, J.); see also Singletary v. Secretary of HHS, 623 F.2d 217, 219 (2d Cir. 1980) (prior work history justifies the inference that when a claimant stopped working, he did so for the reasons stated).  The ALJ failed to consider Durling's work history, the extensive and continuous treatments, multiple medications, the procedures and other pertinent factors in rejecting Durling's credibility. The ALJ's finding in this regard is not supported by substantial evidence.

Durling's motion should be granted on this ground as well.

15

### D. Residual Functional Capacity

Durling contends that there was not substantial evidence in the record to support a conclusion that he was not disabled. The Commissioner contends that the ALJ properly found that Durling can perform other work existing in the national economy.

Residual functional capacity (RFC) describes what a claimant is capable of doing despite his or her impairments.  20 C.F.R. § 404.1545(a) (2002).  "RFC is determined by considering all relevant evidence consisting of, inter alia, [the claimant's] physical abilities, symptoms including pain . . . [or other] limitations which go beyond symptoms." Martone, 70 F. Supp. 2d at 150; (citing 20 C.F.R. §§ 404.1545, 416.945 (1991)). "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." Smith v. Apfel, 69 F. Supp. 2d 370, 378 (N.D.N.Y. 1999) (Hurd, J.) (citing LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.).  In assessing RFC, the ALJ must make findings specifying what functions the claimant is capable of performing, not simply making conclusory statements regarding a claimant's capabilities. Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work or other work in the national economy.  State of N.Y. v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); see generally 20 C.F.R. §§ 404.1520 (2004), 416.960 (2004).

The ALJ concluded that Durling was unable to perform his past relevant work as a police officer and retained the residual functional capacity to perform light work activity which allowed him to change position every twenty to thirty minutes, did not require repetitive bending, did not require working in hazardous situations such as heights, moving machinery, or temperature extremes, and that Durling could lift up to ten pounds

frequently and twenty pounds occasionally. T. 15, 17. The ALJ also found that such jobs

existed in significant numbers in the national economy.  T. 15. The vocational expert

testified that an individual who needed the ability to change positions every twenty to thirty

minutes, could not work around hazardous conditions,  and who could not perform

repetitive bending could perform light work as an order clerk or  cashier. T. 73-77.

Light work is defined as "lifting no more than 20 pounds at a time with frequent

lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may

be very little, a job is in this category when it requires a good deal of walking or standing,

or when it involves sitting most of the time with some pushing and pulling of arm or leg

controls."  20 C.F.R. § 416.967(b).

Dr. Reid found that Durling could sit six hours, stand four hours, and walk two hours

in an eight hour work day, could lift and carry up to twenty pounds occasionally, that he

could occasionally bend but could not squat, crawl, or climb, and that there were no

limitations with respect to grasping, pushing, pulling, and other fine manipulation. T. 169-

70. A non-examining agency physician found that Durling could sit and stand six hours in

an eight hour day, walk four to six hours in an eight hour day, bend occasionally, lift and

carry twenty to fifty pounds occasionally, and  push and pull twenty to fifty pounds

occasionally. T. 179. Dr. J. Engel  found that Durling could sit eight hours, stand six to

eight hours, walk six to eight hours in an eight hour day; that he could bend occasionally,

lift and carry ten pounds frequently and twenty pounds occasionally, and push and and

that he could pull ten to twenty pounds frequently. T. 180.

However, other examining doctors did not make specific findings as to Durling's

exertional and non-exertional capabilities.  Only Drs. Reid and Schlessinger found that

17

Durling was not disabled. Drs. Feyman and Bronk found that Durling was totally disabled, and Drs. Tersesi, Kercull, and Mohler found that Durling was partially disabled. There is not substantial evidence in the record to support the ALJ's finding. Several doctors did not give an opinion on each of the physical requirements of light work, even given the restrictions posed to the vocational expert. As stated above, the ALJ failed to take into account Durling's subjective complaints of pain, which are well supported in the record, and also failed to give controlling weight to the opinions of Durling's treating physicians. There is no substantial evidence in the record to support each of the physical requirements of light work, given the substantial treatments that Durling received, and the number of doctors that examined him and found him unable to return to work.

Durling's motion should be granted on this ground as well.

## E. Remand or Reversal

A reviewing court has the authority to reverse with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3) (1999). Remand is appropriate where there are gaps in the record or further development of the evidence is needed. Curry, 209 F.3d at 124. Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose. Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). Given the voluminous record which supports Durling's claim of disability, "persuasive proof of disability" exists to warrant an award of damages without further review by the Commissioner. Accordingly, reversal and not remand is warranted.

18

## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's finding be reversed and that the case be remanded for the calculation of benefits.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Secretary of HHS., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATE: March 29, 2005
       Albany, New York

United States Magistrate Judge

19